NALEPA v PLYMOUTH-CANTON COMMUNITY SCHOOL
DISTRICT

Docket Nos. 140059, 159043. Submitted July 12, 1994, at Detroit.
    Decided November 21, 1994, at 9:50 A.M. Leave to appeal
    sought.

    Deborah and Lawrence Nalepa, as the personal representatives of
    the estate of Stephen Nalepa, deceased, brought a wrongful
    death action in the Wayne Circuit Court against the Plymouth-
    Canton Community School District, Encyclopedia Britannica
    Educational Corporation, and others. The decedent died by
    asphyxiation. He was found hanging by a belt in his bedroom
    the night after seeing a movie in his second-grade class that
    depicted a young boy's attempt to hang himself. Additional
    defendants included the board of education, the superintendent
    of the school district, the school's principal, various teachers,
    counselors, and faculty, the producer of the film, and the
    distributor of the film, Encyclopedia Britannica. The court,
    Samuel A. Turner, J., denied the school defendants' motion for
    summary disposition based on absolute governmental immu-
    nity, but granted summary disposition for the defendants on
    the basis that the defendants did not owe the decedent a duty
    of care. The school district, the members of the board of
    education, and the superintendent appealed by leave granted
    from the order denying their motion for summary disposition
    based on absolute governmental immunity (Docket No. 140059).
    The plaintiffs appealed as of right from the orders granting
    summary disposition for the defendants on the basis that the

REFERENCES

Am Jur 2d, Municipal, County, School, and State Tort Liability
    §§ 42, 45, 145, 147, 524, 535, 624, 628; Negligence §§ 208, 210, 212.
Modern status of doctrine of sovereign immunity as applied to
    public schools and institutions of higher learning. 33 ALR3d 703.
Tort liability of public schools and institutions of higher learning
    for educational malpractice. 1 ALR4th 1139.
Personal liability of public school teacher in negligence action for
    personal injury or death of student. 34 ALR4th 228.
Liability of school or school personnel in connection with suicide of
    student. 17 ALR5th 179.

defendants did not owe the decedent a duty of care (Docket No. 159043). The appeals were consolidated.

The Court of Appeals *held:*

1. The court erred in finding that MCL 691.1407(5); MSA 3.996(107)(5) does not provide absolute governmental immunity to the board of education or the superintendent when acting within the scope of their authority. A school district is a level of government of the type contemplated by the Legislature in subsection 5, and the superintendent is the highest appointive executive of the school district. MCL 691.1407(2); MSA 3.996(107)(2) is not applicable to the board. The board and the superintendent, in allowing the film to be shown, were acting within the scope of their authority. The court erred in finding that they were entitled to only qualified immunity.

2. The court properly found that Encyclopedia Britannica did not owe the plaintiffs or their decedent a duty of care.

3. Although a duty of care does exist with regard to the principal, teachers, counselors, and other staff members, that duty does not extend to the actions of these defendants alleged here because that duty does not extend to alleged educational or teacher malpractice.

Docket No. 140059, reversed; Docket No. 159043, affirmed.

1. GOVERNMENTAL IMMUNITY — SCHOOL DISTRICTS — BOARDS OF EDUCATION — SUPERINTENDENTS OF SCHOOLS.

A public school district is a level of government contemplated in the governmental immunity act; the members of a public school board of education are the elective executive officials of their level of government and the superintendent of the school district is the highest appointive executive official of the school district, and both are entitled to absolute governmental immunity when acting within the scope of their authority (MCL 380.247, 380.1101, 691.1407[5]; MSA 15.4247, 15.41101, 3.996[107][5]).

2. NEGLIGENCE — DUTY — THIRD PARTIES.

It is not enough for a person merely to act in order for a duty to arise under the proposition that, in certain circumstances, a person who undertakes to render services to another can be liable to third parties for the failure to exercise reasonable care in performing the services; rather, the person must have undertaken to render services to another by assuming an obligation or intending to render services for the benefit of another; an intention or agreement to benefit another will not be found as a result of the mere conferral of some benefit on others.

3. Negligence — Duty — Teachers — Malpractice.

Although Michigan recognizes a teacher's common-law liability for a student's injuries proximately caused by the teacher, public policy must be considered in determining the type of actions to which the teacher's duty of care extends; in Michigan, the duty does not extend to educational or teacher malpractice.

4. Negligence — Educational Malpractice — Public Policy.

Even where the chain of causation is complete and direct, recovery in an action alleging educational or teacher malpractice may be denied on grounds of public policy where any of the following policy considerations exist: the injury is too remote from the negligence or is too wholly out of proportion to the culpability of the negligent tortfeasor; in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; allowance of recovery would place too unreasonable a burden on the defendant; allowance of recovery would be too likely to open the way for fraudulent claims; or allowance of recovery would enter a field that has no sensible or just stopping point.

*Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, P.C.* (by *Barry P. Waldman, Mary Katherine Norton,* and *Barbara M. Robinson*), for the plaintiffs.

*Plunkett & Cooney, P.C.* (by *Christine D. Oldani* and *Laurel F. McGiffert*), for Encyclopedia Britannica Educational Corporation.

*Martin, Bacon & Martin, P.C.* (by *James N. Martin, John W. Crimando,* and *Keith P. Felty,* for the Plymouth-Canton defendants.

*Martin, Bacon & Martin, P.C.* (by *James N. Martin* and *John W. Crimando*) (*Dennis R. Pollard* and *Neil H. Goodman,* of Counsel), for defendants Swartzwelter, Thomas, Artley, Schwinn, Wines, McClendon, Graham, and Hoben.

Before: NEFF, P.J., and MCDONALD and M. WAR-SHAWSKY,* JJ.

NEFF, P.J. These consolidated appeals present issues of governmental immunity, duty, and gross negligence.

In Docket No. 140059, defendants Plymouth-Canton Community School District, the members of the board of education (the board), and Superintendent John Hoben (the superintendent), appeal by leave granted from an order of the circuit court denying their motion for summary disposition based on absolute governmental immunity. In Docket No. 159043, plaintiffs appeal as of right two orders of the circuit court granting summary disposition to defendants on the basis that defendants did not owe plaintiffs' decedent a duty of care and dismissing plaintiffs' complaint. We reverse with respect to Docket No. 140059 and affirm with respect to Docket No. 159043.

I

Plaintiffs' decedent, Stephen Nalepa, was a second-grade student at Gallimore Elementary School, in the Plymouth-Canton Community School District (the school district). On March 23, 1990, Stephen and his classmates were shown the film *Nobody's Useless.*

The film, set in late nineteenth-century America, tells the story of a young amputee who becomes so depressed that he twice tries to commit suicide. One of the attempts involves the boy trying to hang himself. The boy does not succeed in his suicide attempts, and is then taught by an

---

* Circuit judge, sitting on the Court of Appeals by assignment.

older boy how to successfully deal with his handicap.

The night after seeing this movie, Stephen was found hanging by a belt from the safety rail of the upper bunk bed in his bedroom. He was pronounced dead by asphyxiation on arrival at a local hospital.

Plaintiffs then instituted this wrongful death action, suing, among others, the school district, the board, the superintendent, the principal, and various teachers, counselors, and other faculty, as well as Osmond Productions, Inc., the producer of the film, and Encyclopedia Britannica Educational Corporation, the distributor of the film.

In Docket No. 140059, the school defendants appeal the circuit court's April 2, 1991, order denying their motion for summary disposition. In Docket No. 159043, plaintiffs appeal from the circuit court's February 28, 1992, and November 9, 1992, orders granting summary disposition to defendants and dismissing plaintiffs' complaint. The two appeals were consolidated.

II

We first address the governmental immunity issue raised in Docket No. 140059. Because the motion was based on MCR 2.116(C)(7), we review de novo the circuit court's determination. In conducting our review, we examine the affidavits, together with the pleadings, depositions, and documentary evidence. MCR 2.116(G)(5).

A

Defendants school district, the board, and the superintendent argue that the board and the superintendent are entitled to the absolute govern-

mental immunity found in MCL 691.1407(5); MSA 3.996(107)(5).

Plaintiffs respond by citing cases construing our Supreme Court's opinion in *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984), that suggest that superintendents and board members are not entitled to absolute immunity.

B

Before 1986, the law of governmental immunity, as it related to individual officers, employees, and agents, was a creature of judicial decision making. *Bischoff v Calhoun Co Prosecutor,* 173 Mich App 802, 804; 434 NW2d 249 (1988). In 1984, in an attempt to clarify the law regarding individual governmental immunity, the Michigan Supreme Court in *Ross, supra* at 592, 633-634, distinguished between two categories of individual immunity, one for high level officials and one for lower level officials.[1]

In 1986, in response to the Court's opinion in *Ross,* our Legislature enacted 1986 PA 175, which amended MCL 691.1407; MSA 3.996(107). Although the Legislature borrowed much of the language for its amendments from the Supreme Court

---

[1] The Court in *Ross, supra* at 592, held in pertinent part:

Judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their respective judicial, legislative, and executive authority. Lower level officers, employees, and agents are immune from tort liability only when they are

a) acting during the course of their employment and are acting, or reasonably believe they are acting, within the scope of their authority;

b) acting in good faith; and

c) performing discretionary-decisional, as opposed to ministerial-operational, acts.

opinion, it did not simply parrot that language. Thus, with regard to absolute governmental immunity, MCL 691.1407(5); MSA 3.996(107)(5) now provides:

> Judges, legislators, and the elective or highest appointive executive officials of all levels of government are immune from tort liability for injuries to persons or damages to property whenever they are acting within the scope of their judicial, legislative, or executive authority.

C

The circuit court, construing this provision, determined that neither the board nor the superintendent enjoyed absolute governmental immunity because neither exercised the broad discretion contemplated by the statutory definition. We disagree.

The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *Farrington v Total Petroleum, Inc,* 442 Mich 201, 212; 501 NW2d 76 (1993). Although when the plain and ordinary meaning of a statute's language is clear, judicial construction of the statute is not permitted, *Lorencz v Ford Motor Co,* 439 Mich 370, 376; 483 NW2d 844 (1992), when necessary, the rules of statutory construction can serve as guides to assist in determining the Legislature's intent with a greater degree of certainty, *Nolan v Dep't of Licensing,* 151 Mich App 641, 648; 391 NW2d 424 (1986). Also, if a term is not defined in the statute itself, a court may consult dictionary definitions. *People v Downey,* 183 Mich App 405, 409; 454 NW2d 235 (1990).

1

To determine whether the board and the super-

intendent enjoy absolute governmental immunity we must first examine whether a school district is a "level of government." See MCL 691.1407(5); MSA 3.996(107)(5). We conclude that it is.[2]

A school district shares many aspects of governance with other political subdivisions traditionally considered levels of government. A school district, like a county, township, or city, encompasses a defined geographical area. Like these other forms of government, a school district has the power to levy taxes. MCL 380.1211; MSA 15.41211. A school district has the power of eminent domain. MCL 380.1621; MSA 15.41621. The decisions made at the school district level have a wide effect on the community not unlike decisions made by other political subdivisions. Finally, like the governing bodies of other political subdivisions, the board of a school district is elected by the voters who live in the school district. MCL 380.1101; MSA 15.41101.

On the basis of these characteristics, we conclude that a school district is a level of government of the type contemplated by the Legislature in the statute regarding absolute governmental immunity.

2

Our next task is to determine whether the board members and the superintendent are entitled to the bar of absolute governmental immunity. We conclude they are.

a

We find that the school board members are the

---

[2] Because we take judicial notice that the school district here is a third-class school district, where relevant, we cite to that portion of the School Code, MCL 380.1 *et seq.*; MSA 15.4001 *et seq.*, that refers to third-class school districts. We cite those sections only for brevity, and we do not mean to limit the applicability of our holding today to third-class school districts.

elective executive officials of their level of government. MCL 380.1101; MSA 15.41101.

In reaching this conclusion, we reject plaintiffs' argument that subsection 2 of the governmental immunity act, MCL 691.1407(2); MSA 3.996(107)(2), is applicable to the board. That subsection provides:

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question . . . *each member of a board* . . . shall be immune from tort liability for injuries to persons or damages to property caused by the officer, employee, or member while in the course of employment or service or volunteer while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. [Emphasis added.]

To apply this subsection merely because it mentions "board members" would be to read out of subsection 2 the phrase "[e]xcept as otherwise provided in this section." Also, this interpretation of the provision would read subsection 5 of the governmental immunity act out of the statute entirely. The board of education, being comprised of elective officials for a level of government, fits more precisely within subsection 5 than subsection 2, and, where a more specific statutory provision

applies, it governs over the general provision. See, e.g., *Jenkins v Carney-Nadeau Public School,* 201 Mich App 142, 145; 505 NW2d 893 (1993).

b

Next, we conclude that the superintendent of the school district is also absolutely immune from tort liability under MCL 691.1407(5); MSA 3.996(107)(5).

Examining the plain wording of the statute reveals that absolute governmental immunity is afforded to the "highest appointive executive officials of all levels of government." MCL 691.1407(5); MSA 3.996(107)(5).

A superintendent of a school district meets the first requirement for absolute immunity because superintendents are appointed by the board. MCL 380.247; MSA 15.4247.

The superintendent is also an executive official. An executive is a person whose job "pertain[s] to or [who is] charged with the execution of laws or the administration of public affairs." *The Random House College Dictionary: Revised Edition* (1984).

The superintendent is the administrator who, among other duties, executes the dictates of the board, MCL 380.248(h); MSA 15.4248(h), and is responsible for the day-to-day operation of the school, see, e.g., MCL 380.248(c) and (h); MSA 15.4248(c) and (h). We conclude that this job description fits within the definition of an executive.

Finally, the superintendent is the highest appointive executive of the school district. The superintendent is employed by, and answers only to, the school board, the elective body of the district. MCL 380.247; MSA 15.4247.

In reaching our conclusion, we are mindful of cases holding that a superintendent is not entitled

to absolute immunity. See *Giddings v Detroit,* 178 Mich App 749; 444 NW2d 242 (1989), and *Kirschner v Carney-Nadeau Public Schools,* 174 Mich App 642; 436 NW2d 416 (1989). We decline to follow these cases because they construe governmental immunity law as it stood before the Legislature enacted 1986 PA 175. In enacting its own definition of absolute governmental immunity, the Legislature changed the scope of the judicially created absolute governmental immunity rule. Cf. *Pulver v Dundee Cement Co,* 445 Mich 68, 75; 515 NW2d 728 (1994).[3] We do not determine here whether the *Giddings* and *Kirschner* cases were wrongly decided, we merely follow the plain wording of MCL 691.1407(5); MSA 3.996(107)(5).

3

Finally, we conclude that the board and the superintendent, in allowing this film to be shown to Stephen's second-grade class, were acting within the scope of their authority. See MCL 380.244(a); MSA 15.4244(a) and MCL 380.248(h); MSA 15.4248(h). The film dealt with mental health issues, about which our state has evinced a concern. See MCL 388.381 *et seq.*; MSA 15.1958(1) *et seq.*

4

We hold that the board and the superintendent

---

[3] The Supreme Court held in *Pulver, supra* at 75:

> [W]hen the Legislature codifies a judicially defined requirement without defining it itself, a logical conclusion is that the Legislature intended to adopt the judiciary's interpretation of that requirement.

With respect to governmental immunity, however, the Legislature did define the term in part in subsection 5 of the governmental immunity act, and that definition is different from the one created by the judiciary. Thus, it does not necessarily follow that the Legislature meant to adopt the judiciary's definition.

of the school district are entitled to absolute governmental immunity from tort liability when acting within the scope of their authority.[4] Thus, we conclude that the circuit court erred in finding that the board and the superintendent were only qualifiedly immune.

Our decision renders moot defendants' next argument, that the circuit court erred in finding a question of fact with regard to whether the board and the superintendent acted with gross negligence.

### III

In Docket No. 159043, plaintiffs appeal the lower court's determination that neither defendant Encyclopedia Britannica nor the school defendants owed a duty of care to Stephen.

### A

With respect to defendant Encyclopedia Britannica, plaintiffs argue that the distributor assumed a duty of care through its contract with the producer to provide a catalogue that described the film, and to recommend that the film was appropriate for grade levels intermediate to junior high. According to plaintiffs, once Encyclopedia Britannica undertook these actions, a duty then arose to third parties, i.e., the second graders, including Stephen, to perform the tasks with due care. We disagree.

In *Smith v Allendale Mutual Ins Co,* 410 Mich 685; 303 NW2d 702 (1981), our Supreme Court was

---

[4] We conclude that the governmental agencies involved in this action are entitled to absolute governmental immunity as well. MCL 691.1407(1); MSA 3.996(107)(1).

faced with a similar question. In that consolidated case, the defendants-insurance companies conducted fire inspections of their insureds' premises. After fires occurred injuring or killing several of the insureds' employees, the plaintiffs-employees filed complaints against the insurance companies alleging that the companies breached an assumed duty of care to them by failing to inspect carefully. The Supreme Court determined that the defendants-insurance companies did not owe the plaintiffs-employees a duty of care.

The plaintiffs there, similar to plaintiffs here, relied in part on § 324A of the Restatement Torts, 2d, which provides that, in certain circumstances, when one undertakes to render services to another, the actor can be liable to third parties for the failure to exercise reasonable care in performing the services. See *Smith, supra* at 705, 712.

When considering the proposition set forth in § 324A, the Court stressed that in order for the duty to arise, it is not enough for the actor merely to act; rather, the actor must have undertaken to render services to another. *Smith, supra* at 716. There, the Court concluded that no duty would arise unless the insurance companies intended or agreed to benefit either the employers or the plaintiffs-employees. *Id.* The Court held that this intention or agreement will not be found, however, with the mere conferral of some benefit to those parties, because persons pursuing their own interests often benefit others. *Id.* at 717-718. The evidence must show that the actor either assumed an obligation or intended to render services for the benefit of another. *Id.* at 717.

The Court in *Smith* determined that when the defendants-insurance companies inspected the insureds' premises, they did so with their own inter-

ests in mind—namely risk reduction, a basis for rate increases or decreases, and so forth—and not to benefit either the insureds or the plaintiffs-employees. *Id.* at 718. According to the Court, a duty would only have arisen had the insurance companies promised to provide complete fire inspections to alert the insureds of danger, or if they had informed their insureds that they no longer had to monitor their facilities for fire danger. *Id.* at 718-719.

Here, although Encyclopedia Britannica did act when it created promotional material (with some indications of age appropriateness) for the film, that act did not represent a service to schools or students watching the film. Although the age appropriateness standards, and the description, may have conferred some benefit on the schools and children, that was not the purpose for which the material was produced. Rather, Encyclopedia Britannica created the descriptions in furtherance of distribution of the film pursuant to its contract with the producer, Osmond Productions, Inc. Encyclopedia Britannica did not indicate to the schools that they no longer had to review films distributed by Encyclopedia Britannica, nor did it suggest that Encyclopedia Britannica's age appropriateness guidelines were conclusive.

We find that Encyclopedia Britannica did not undertake a service to benefit the schools or the children. Thus, we agree with the circuit court that defendant Encyclopedia Britannica did not owe plaintiffs or Stephen a duty of care.

B

With respect to the remaining defendants—the principal, teachers, counselors, and other staff

members[5]—we conclude that although a duty of care exists, that duty does not extend to the actions of these defendants, which allegedly caused Stephen's death.

Although Michigan recognizes a teacher's common-law liability for a student's injuries proximately caused by the teacher, public policy must be considered in determining to what type of actions that duty extends. *Johnson v Clark,* 165 Mich App 366, 369-370; 418 NW2d 466 (1987). Michigan law is clear that the duty does not extend to educational malpractice. *Id.* at 369.

Plaintiffs' basic allegation is that the teachers and faculty had a duty to not show this film to second graders. In other words, plaintiffs allege that the teachers and faculty utilized improper materials in teaching their child. We conclude that allegations that teachers and faculty used improper materials and techniques to teach children amount to claims of teacher malpractice.

The rationale for declining to recognize claims of teacher malpractice stems from the collaborative nature of the teaching process. See *Ross v Creighton Univ,* 740 F Supp 1319, 1328 (ND Ill, 1990), aff'd in part and rev'd and remanded in part on other grounds 957 F2d 410 (CA 7, 1992). For a positive result to obtain, both teacher and student must work together. The ultimate responsibility for what is learned, however, remains with the student, and many considerations, beyond teacher misfeasance, can factor into whether a student receives the intended message. *Id.* Further, teaching methods vary, and what is considered appropriate by some, may be considered inappropriate by others. Thus, because both the educational

---

[5] Because we have already determined that the board and superintendent are absolutely immune, we express no opinion regarding whether they owed a duty of care in this case.

process and the result are subjective, there exists a practical impossibility of proving whether the alleged malpractice caused the complained-of injury. *Id.*

Even if the harm appears to flow from the alleged malpractice, for public policy reasons, we would still decline to recognize a duty. We agree with the Supreme Court of Wisconsin's statement in another educational malpractice case:

> "Even where the chain of causation is complete and direct, recovery may sometimes be denied on grounds of public policy because (1) the injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden [on the defendant]; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point." [*Wilson v Continental Ins Cos,* 87 Wis 2d 310, 323-324; 274 NW2d 679 (1979), quoting *Rieck v Medical Protective Co,* 64 Wis 2d 514, 517-518; 219 NW2d 242 (1974).]

A number of these policy considerations are applicable to this case. First, we conclude that the injury to Stephen is out of proportion to any culpability of the teachers, or at least appears too highly extraordinary in relation to the alleged negligence. Further, we conclude that recognizing this cause of action could lead to a flood of litigation that would be detrimental to our already overburdened educational system. See *Creighton Univ,* 957 F2d 414. Finally we do not wish to embroil our courts into overseeing the day-to-day operations of our schools. *Id.*

We conclude that the decision to show the film was based on academic factors. Therefore, any cause of action arising from that decision must fit within the educational malpractice genre. As a result, we agree with the trial court that the remaining defendants' duty of care did not extend to the defendants' actions of utilizing an allegedly improper teaching device. In making this determination, we do not conclude that there could be no set of circumstances under which a duty would exist, we merely conclude that where, as here, a plaintiff's injury is predicated on an essentially educational decision, no duty exists.

Docket No. 140059 is reversed. Docket No. 159043 is affirmed. Plaintiffs' complaint is dismissed.